[No. B193604. Second Dist., Div. One. June 19, 2009.]

ROBERT BISNO, Plaintiff and Appellant, v.
DOUGLAS EMMETT REALTY FUND 1988 et al., Defendants and
Appellants.

[No. B195422. Second Dist., Div. One. June 19, 2009.]

ROBERT BISNO, Plaintiff and Respondent, v.
DOUGLAS EMMETT REALTY FUND 1988 et al., Defendants and
Appellants.

**Counsel**

Nagler & Associates, Lawrence H. Nagler and David F. Berry for Plaintiff and Appellant and for Plaintiff and Respondent.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, Caroline E. Chan; Law Offices of Sherwood and Hardgrove, Don C. Sherwood; Hinshaw & Culbertson, John W. Sheller and Filomena E. Meyer for Defendants and Appellants.

**Opinion**

**RUBIN, J.**[*]—Douglas Emmett Realty Fund 1998 and Douglas, Emmett & Company appeal from the judgment entered after a jury found them liable for violating provisions of two Santa Monica rent control ordinances: (1) prohibiting notices to quit and eviction actions except on certain enumerated grounds; and (2) making unlawful demands for excessive rent. The plaintiff in that action, Robert Bisno, cross-appeals from a pretrial order summarily adjudicating that the affirmative defense of reliance on advice of counsel barred his malicious prosecution cause of action, and from the denial of his JNOV (judgment notwithstanding the verdict) motion on his breach of contract claim. We hold that there were no triable issues of fact to defeat reliance on the advice-of-counsel defense and, therefore, affirm the summary adjudication order. Finding the litigation privilege (Civ. Code, § 47, subd. (b)) applies, we reverse the judgment outright as to the rent control claims based on the eviction notice and unlawful detainer action. We also reverse the judgment as to the rent control claim for excessive rent demands but permit retrial because whether the litigation privilege applies in the present setting is a question of fact and the jury was not instructed to consider that defense. We affirm the order denying Bisno's motion for partial JNOV on his breach of contract cause of action. We also reverse the order awarding Bisno attorney's fees, allowing the parties to renew their respective motions upon resolution of the remaining claim.

### FACTS AND PROCEDURAL HISTORY

Robert Bisno rented an apartment at The Shores, a Santa Monica highrise, in 1996. Although Bisno had been married for several years to Jeanette Bisno, she was not mentioned in the lease at all, and he was the only person to sign the lease and be designated as a tenant. In 1998, The Shores was

---

[*]Justice of Division Eight of the Court of Appeal, Second District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

bought by Douglas Emmett Realty Fund 1998, a California limited partnership, which designated Douglas, Emmett & Company to serve as the property's manager.[1] Under the lease, Bisno had a month-to-month tenancy at a monthly rate of $933. The lease said no one but Bisno could occupy the unit without first obtaining the owner's consent, and that Bisno could not assign or sublet the unit. Paragraph 12 of the lease provided that the monthly rent would increase to $2,000 if Bisno assigned or sublet the unit, whether with or without the owner's consent.

When Bisno rented the unit in 1996, he and Jeanette lived in Berkeley, where they owned a home and where Bisno worked as the CEO of a real estate development company.[2] Bisno would sometimes stay at the unit when he was in Los Angeles on business, and Jeanette would sometimes stay there too. The Bisnos moved to Southern California in 2000 and bought a parcel of land in Beverly Hills in an area known as Beverly Park, where they began to build a house. While construction was underway, they lived in a rented house also in Beverly Hills. Jeanette filed for divorce in December 2001, and Bisno moved into The Shores in early 2002. He stayed there until the fall of 2002, when he moved into the newly built home in Beverly Park. In April 2003, Jeanette moved into The Shores, intending to make Bisno's unit her primary residence. At or about that time, Bisno asked Emmett to make Jeanette a tenant on the lease.

We digress to describe some unpleasantries between Bisno and Emmett leading up to Jeanette's move to The Shores. Back in mid-May 2000, Bisno and Emmett had a dispute over the number of parking spaces Bisno was allowed. Although the lease allotted him only one space, Bisno was using two. When Emmett tried to enforce the lease and take back one of the spaces, Bisno contended the prior owner of The Shores had agreed to give him two spots. The prior owner eventually confirmed this, and Emmett let Bisno keep both spaces. In June 2001, Jeanette and the Bisnos' son were initially denied entrance to Bisno's unit when they asked to move in some items. The Shores's personnel did not know who Jeanette was and asked her for identification. She produced a driver's license, but, because she was not listed in The Shores's directory as either a tenant, occupant, or permitted visitor, they insisted on confirming her identity with Bisno. Although Bisno's secretary confirmed Jeanette's identity, Bisno was not available, and The Shores's personnel insisted on seeing a marriage certificate before they would open the

---

[1] For ease of reference, we will refer to these two entities as Emmett. We will refer to Robert Bisno by his last name, to his wife by her first name, and to them both collectively as the Bisnos.

[2] Bisno is also a licensed California lawyer, but does not practice law.

unit for Jeanette. She was eventually allowed in, and was soon after added to Bisno's guest list for entry.[3]

On February 18, 2003, Bisno wrote Emmett to give notice that his rent on the unit would be paid monthly by automatic electronic transfer to Emmett's bank. Bisno also wrote that "[a]lthough the unit is my wife's residence, my payment of the rent is pursuant to an agreement between us. (This is a private matter and I am not interested in publicity.)" By separate letter that same day, Bisno wrote to Jay Hotch, The Shores's property manager, about a meeting they had planned. Bisno said, "As you probably surmised, based upon my request to do certain improvements to the unit, my wife is looking to make the unit her residence."

On March 28, 2003, Emmett, represented by Attorney Don Sherwood, served the Bisnos with a notice of intent to file a petition seeking to raise the monthly rent from the then current rent controlled rate of around $1,000 to the market rate of more than $4,000. Under section 3304 of the Santa Monica Rent Control Charter Amendment (C.A. section 3304), such a one-time increase was allowed if the tenant did not occupy the rental unit, based on a determination that the unit was not his "usual residence of return." The petition was filed on April 8, 2003, and a hearing officer of the Santa Monica Rent Control Board (Board) conducted a hearing on the petition on May 28, 2003.[4] The hearing officer issued her decision on August 1, 2003. Because Bisno had not resided in the unit since late 2002 and was now living in his newly built home in Beverly Hills, the hearing officer found that Bisno's unit at The Shores was not his residence of return. Because Jeanette was not a named tenant and had never made The Shores her home, she had a limited right of occupancy but was not a tenant or a subtenant. Finally, because Jeanette had seldom lived in the unit by the time of the hearing, it was not her usual residence of return. Based on those findings, the hearing officer found that The Shores was entitled to increase the monthly rent on Bisno's unit to the market rate.

Bisno appealed that decision. The Board's staff recommended that it be affirmed in a report prepared for the Board's October 2003 meeting. The appeal was denied and, at a postappeal hearing, the hearing officer set the fair market monthly rent of Bisno's unit at $4,045. Bisno sued the Board,

---

[3] We have omitted many of the details surrounding these two incidents. It is enough to note that both disputes were heated and infuriated Bisno.

[4] In June 2003, the Bisnos and Emmett had another heated dispute that was touched off when Jeanette tried to move certain items into Bisno's unit without first having reserved a time to use an elevator. This led to a shouting match between Jeanette and one of The Shores's personnel, who placed a parking sticker on Jeanette's car. Jeanette responded by peeling off the sticker and placing it on the employee's forehead. The police were called and the employee pressed assault charges against Jeanette.

contending that C.A. section 3304 was invalid because the Board exceeded its authority when it enacted that measure. Bisno was granted a preliminary injunction enjoining any attempt to implement the rent increase. Bisno ultimately lost at trial, and the judgment for the Board was affirmed by this court in *Bisno v. Santa Monica Rent Control Bd.* (2005) 130 Cal.App.4th 816 [30 Cal.Rptr.3d 441] (*Bisno I*).

During argument at the Board hearing, Bisno's lawyer contended that a rent increase under C.A. section 3304 was not proper, but acknowledged that one might be authorized by the Costa-Hawkins Rental Housing Act. (Civ. Code, § 1954.50 et seq.)[5] After the trial court in *Bisno I* preliminarily enjoined enforcement of the rent increase approved by the Board, Trial Attorney Sherwood spoke with Emmett's general counsel, William Kamer, to discuss the point made by Bisno's lawyer concerning the applicability of the Costa-Hawkins Act, section 1954.53, subdivision (d)(1). After discussing the issue with Kamer and researching the Costa-Hawkins Act, Sherwood concluded that the act provided Emmett another means of raising the rent on Bisno's unit. He had Emmett's portfolio manager, Michael Boge, prepare a 60-day notice of rent increase. After certain changes recommended by Sherwood were made to that draft, Emmett served the notice on Bisno. Citing to section 1954.53, subdivision (d), the notice said that the rent increase was authorized under the Costa-Hawkins Act because Jeanette was a lawful sublessee, and demanded a new monthly rent of $4,295.

Sherwood recommended that a lawyer with true Costa-Hawkins expertise be hired to review the 60-day notice that had been served, confirm there was a valid legal basis for the rent increase under Costa-Hawkins, and then take care of an unlawful detainer action against Bisno should one become necessary. Acting on this recommendation, Emmett hired lawyer Craig Mordoh, an unlawful detainer specialist with Costa-Hawkins experience. Although there is a dispute as to which documents Mordoh reviewed, it is undisputed that he reviewed the lease and the Board hearing officer's report, and advised Emmett that it had a valid claim under the Costa-Hawkins Act. When Bisno refused to pay the increased rent, Mordoh prepared and served a three-day notice to pay rent or quit in February 2004. When that was ignored, Mordoh prepared, filed, and served an unlawful detainer action against the Bisnos.

---

[5] We will refer to this act as the Costa-Hawkins Act. We discuss this act in detail below, but, in short, it allows landlords to set the initial rental rate at the start of a tenancy, and to raise the rent according to a formula pegged to the market rate under certain circumstances when an original tenant moves out. All further undesignated section references are to the Civil Code.

In June 2004, counsel for Bisno wrote Mordoh to point out several perceived flaws in the unlawful detainer action.[6] According to the lawyer, Costa-Hawkins did not apply because Jeanette was an "original occupant" of the unit, had lived there for some time with Emmett's knowledge and consent, and was not a subtenant. The letter threatened a malicious prosecution action and a claim for attorney's fees for defending the unlawful detainer action. Mordoh read Bisno's lease again and realized he had missed paragraph 12, which set the rent in case of a sublease or assignment at $2,000 per month, an amount that would control under the Costa-Hawkins Act. Although Mordoh believed a Costa-Hawkins rent increase in the reduced amount would be valid, he recommended that Emmett dismiss the unlawful detainer action for several reasons: the costs of proceeding with that action; the likelihood of an appeal by Bisno if he lost; the cost of attorney's fees if Bisno prevailed; and the termination of the preliminary injunction in *Bisno I*, which reinstated the rent increase approved by the Board. Based on this advice, Emmett dismissed the unlawful detainer action.

Bisno then sued Emmett for malicious prosecution for having brought the unlawful detainer action. Bisno alleged that the unlawful detainer action was just the last step in a campaign of harassment by Emmett designed to drive him from his rent-controlled apartment. His complaint also included causes of action under two provisions of Santa Monica's rent control laws: charter amendment section 1806 (C.A. section 1806), which establishes a cause of action for wrongful eviction, including actual and punitive damages, against landlords who serve notices to quit or bring unlawful detainer actions unless the tenant has failed to pay the rent or otherwise committed some material breach of the lease; and charter amendment section 1809 (C.A. section 1809), which establishes a cause of action based on improper demands for unwarranted and excessive rent, including actual damages, attorney's fees, and a civil penalty of treble damages if the landlord acted willfully and maliciously. Bisno also stated a cause of action for breach of contract, based on allegations that Emmett demanded an unauthorized rent increase and refused to accept the lawful rent of $1,100; brought the unwarranted unlawful detainer action; and breached his covenant of quiet enjoyment.

Before Bisno's action against Emmett went to trial, the court made two critical rulings. First, it denied Emmett's motion for leave to amend its answer to assert the litigation privilege as an affirmative defense. Second, it denied Emmett's motion for summary judgment, but granted its motion for summary adjudication of the malicious prosecution claim because it found that Emmett established as a matter of law the affirmative defense of good faith reliance on the advice of counsel. The remaining causes of action went

---

[6] Bisno was represented by the law firm of Irell & Manella during the unlawful detainer proceedings.

to the jury, which found that Emmett had violated C.A. sections 1806 and 1809, and did so maliciously and in bad faith, and awarded Bisno more than $900,000 in punitive damages. The jury also found that Emmett had not breached its contract with Bisno. After various posttrial motions, the judgment awarded Bisno damages of $77,856 under C.A. section 1806, and $47,760 under C.A. section 1809. Following additional posttrial motions, the trial court reduced the punitive damage award to $311,420. Bisno was awarded costs of more than $19,000 and attorney's fees of more than $700,000.

On appeal, Emmett contends (1) the trial court erred by denying its motion to amend its answer and assert the litigation privilege as a defense; (2) the litigation privilege bars both causes of action under the rent control laws; and (3) as the prevailing party on the contract cause of action, it was Emmett who was entitled to attorney's fees, not Bisno.[7] Bisno has cross-appealed, contending the trial court erred by granting summary adjudication of his malicious prosecution claim, and the jury's determination that Emmett did not breach the lease was in error.

## DISCUSSION

A. *Summary Adjudication Was Properly Granted on the Malicious Prosecution Claim*

1. *Standard of Review*

Summary judgment (or adjudication of a single cause of action) is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) In reviewing an order granting summary adjudication, we must assume the role of the trial court and redetermine the merits of the motion. In doing so, we must strictly scrutinize the moving party's papers. The declarations of the party opposing summary adjudication, however, are liberally construed to determine the existence of triable issues of fact. All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the opposing party. While the appellate court must review a summary adjudication motion by the same standards as the trial court, it must independently determine as a matter of law the construction and effect of the facts presented. (*Barber v. Marina Sailing, Inc.* (1995) 36 Cal.App.4th 558, 562 [42 Cal.Rptr.2d 697].)

A defendant moving for summary adjudication meets its burden of showing that there is no merit to a cause of action if that party has shown that one or

---

[7] Emmett also contends there was insufficient evidence to support the existence and amount of the punitive damage award. Because we reverse and remand for further proceedings, we need not reach those issues.

more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subds. (*o*)(2), (p)(2).) If the defendant does so, the burden shifts back to the plaintiff to show that a triable issue of fact exists as to that cause of action or defense. In doing so, the plaintiff cannot rely on the mere allegations or denial of her pleadings, "but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (Code Civ. Proc., § 437c, subd. (p)(2).) A triable issue of material fact exists "if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. [Fn. omitted.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

Our first task is to identify the issues framed by the pleadings. (*Lennar Northeast Partners v. Buice* (1996) 49 Cal.App.4th 1576, 1582 [57 Cal.Rptr.2d 435].) The moving party need address only those theories actually pled, and an opposition which raises new issues is no substitute for an amended pleading. (*Tsemetzin v. Coast Federal Savings & Loan Assn.* (1997) 57 Cal.App.4th 1334, 1342 [67 Cal.Rptr.2d 726].)

### 2. The Costa-Hawkins Act

The Costa-Hawkins Act was enacted in 1995. It established what is known as "vacancy decontrol," providing that notwithstanding any other provision of law, all residential landlords may establish the initial rental rate for a unit, except in specified situations. (§ 1954.53, subd. (a); *Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1237 [63 Cal.Rptr.3d 398, 163 P.3d 89] (*Action Apartment*).) As a result, landlords may impose whatever rent they choose at the start of a tenancy. (*Ibid.*) In addition, landlords may increase the rent for a "lawful sublessee or assignee" when the original occupants "who took possession of the dwelling or unit pursuant to the rental agreement with the owner no longer permanently reside there." (§ 1954.53, subd. (d)(2).) This right does not apply to "partial changes in occupancy . . . where one or more of the occupants of the premises, pursuant to the agreement with the owner provided for above, remains an occupant in lawful possession of the dwelling or unit, or where a lawful sublessee or assignee who resided at the dwelling or unit prior to January 1, 1996, remains in possession of the dwelling or unit." (§ 1954.53, subd. (d)(3).) Although the landlord may raise the rent according to a formula pegged to the fair market value (see § 1954.53, subd. (c)), nothing in the statute precludes "express establishment in a lease . . . of the rental rates to be applicable in the event the rental unit subject thereto is sublet." (§ 1954.53, subd. (d)(1).)

Finally, because Costa-Hawkins creates an incentive for landlords to evict tenants paying rent below the market rate, the statute expressly preserves the

authority of local governments to regulate or monitor the grounds for eviction. (§ 1954.53, subd. (e).)

### 3. Overview of Malicious Prosecution Principles

■ To prevail on a claim for malicious prosecution, the plaintiff must show the prior action was begun with malice and without probable cause at the defendant's direction and was terminated in the plaintiff's favor. The probable cause element is objective, not subjective, with the trial court required to determine whether, on the basis of the facts known to the defendant, it was legally tenable to bring the prior action. The benchmark for legal tenability is whether any reasonable attorney would have thought the claim was tenable. (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871 [254 Cal.Rptr. 336, 765 P.2d 498].) Good faith reliance on the advice of counsel, after truthful disclosure of all the relevant facts, is a complete defense to a malicious prosecution claim. (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 53–54 [118 Cal.Rptr. 184, 529 P.2d 608].)

Emmett's summary adjudication motion was based on declarations from Hotch, Boge, and Kamer, who stated they relied solely on the advice of lawyers Sherwood and Mordoh before seeking a rent increase under Costa-Hawkins, then serving a three-day notice to quit and unlawful detainer action after Bisno refused to pay the higher rent. Their accounts were backed up by lawyers Sherwood and Mordoh, who stated they had reviewed the entire Bisno tenant file and the lease before giving their advice, but had failed to notice the paragraph 12 limit of $2,000 for rent in case the unit was sublet.

Bisno contends the unlawful detainer action constituted malicious prosecution because there was no probable cause to seek a Costa-Hawkins increase of $4,295 when paragraph 12 of the lease limited any such increase to $2,000. He contends there was no probable cause to seek a Costa-Hawkins increase in any amount because Jeanette was an original tenant, the rent control hearing officer found she was not a subtenant, as asserted in Emmett's Costa-Hawkins demand, and because of Emmett's acceptance of rent after she moved in. In connection with the advice-of-counsel defense, Bisno contends Emmett did not provide Mordoh with the tenant file, which included documents that cast doubts on the validity of a Costa-Hawkins rent increase. He also contends Boge and Hotch were aware of paragraph 12, but failed to point it out to either Sherwood or Mordoh. Therefore, according to Bisno, there were triable issues of fact concerning whether Emmett fulfilled its duty to make full disclosure to counsel for purposes of the advice-of-counsel defense.

4. *There Were No Triable Fact Issues Concerning Emmett's Disclosures*

 a. *Duty to Disclose Is Limited to Factual Information*

Although Emmett sought to increase Bisno's rent to the fair market rate of $4,295, paragraph 12 of his lease contained a provision limiting a rent increase to $2,000 in the case of a lawful assignment or sublease. Both Sherwood and Mordoh overlooked that provision when reviewing Bisno's lease and instead advised Emmett that it had a valid claim for the larger rent increase. Because Hotch and Boge were generally aware that such provisions existed in the leases of tenants at The Shores, Bisno contends this was a fact they were obligated to point out to their lawyers. Their failure to do so, he contends, did not fulfill their duty of full disclosure as required by the advice-of-counsel defense.

 We disagree. Sherwood and Mordoh were asked to advise whether a Costa-Hawkins rent increase was permitted. Appellate cases on the failure to disclose concern a client's failure to disclose known facts, such as statements, events, or circumstances. (See *Weber v. Leuschner* (1966) 240 Cal.App.2d 829, 837–838 [50 Cal.Rptr. 86] [malicious prosecution based on criminal charge for issuing a check with insufficient funds; defendant failed to tell his lawyer that the party who wrote the check called to say he had stopped payment because of a dispute over goods purchased with that check]; *Klotz v. Alexander* (1962) 203 Cal.App.2d 238, 244–245 [21 Cal.Rptr. 305] [failure to tell city attorney of personal feud with the malicious prosecution plaintiff when describing facts of case to city attorney in order to procure the plaintiff's arrest]; *Schubkegel v. Gordino* (1943) 56 Cal.App.2d 667, 669–670 [133 P.2d 475] [landlord who had tenant arrested for defrauding an innkeeper failed to tell his lawyer about a conversation with the tenant that made it appear the landlord had waived his security lien on certain items the tenant took upon vacating].)

The cases all speak of the failure to disclose *facts*: none has held that a client who provides a copy of a contract to counsel, when seeking legal advice about his rights under the contract, is obligated to point out any particular provision or a legal theory to the lawyer as a prerequisite to the advice-of-counsel defense.[8] Clients engage counsel to tell them what a

---

[8] Bisno cites *Bertero v. National General Corp., supra,* 13 Cal.3d at pages 54–55, for the proposition that a malicious prosecution defendant may not rely on the advice-of-counsel defense simply by turning over all relevant documents, because it is not sufficient to turn the lawyer loose on a fishing expedition through those documents. There is no discussion in *Bertero* of what the defendant failed to disclose, and the court said that the evidence did not show that the defendant disclosed "specific facts." Cited for this proposition are decisions

contract means and what provisions are significant to their rights and obligations. Adopting Bisno's argument would effectively undermine the defense whenever a client was aware of a contract provision that turned out to weaken his case. Finally, as a necessary corollary to this, the rule of full disclosure is satisfied when the lawyer has obtained the undisclosed information from some other source. (*Singleton v. Singleton* (1945) 68 Cal.App.2d 681, 695 [157 P.2d 886]; *Foster v. Banks* (1931) 112 Cal.App. 622, 627 [297 P. 106].) Because Sherwood and Mordoh had the lease, they had the information Bisno contends Emmett failed to disclose.[9]

Bisno also contends Emmett failed to ask Mordoh for legal advice about the applicability of two other Costa-Hawkins provisions. The first concerned the testimony of Boge and Hotch at the rent control hearing that they believed Jeanette was a lawful occupant of Bisno's unit. Based on that belief, Bisno contends Mordoh should have been asked to advise whether a Costa-Hawkins rent increase was permitted under section 1954.53, subdivision (d)(3), which states that an increase is not permitted where one occupant moves out, but another occupant remains. The second concerned Emmett's acceptance of rent from Bisno after learning Jeanette intended to occupy the unit as her primary residence. Based on that, Bisno contends Mordoh should have been asked whether the rent increase was permitted under section 1954.53, subdivision (d), which states that no waiver of a prohibition against subletting occurs unless a landlord accepts rent from a party to the lease after receiving written notice of the sublease from that party.

 As above, if these alleged facts existed and were in fact disclosed to counsel as part of a request to give advice on the applicability of a particular statute, the client has fulfilled its duty of disclosure under the advice-of-counsel defense and has no obligation to ask the lawyer to consider any particular provisions of the statute.[10] We next consider Bisno's argument that Emmett did not make the required factual disclosures.

---

where the malicious prosecution failed to disclose known facts. None of those decisions holds that a client must point out specific provisions in a contract as to which legal advice is sought, and neither does *Bertero*.

Although we could imagine a situation in which a contractual obligation was buried in a slew of documents transmitted to an attorney in the hope of its being overlooked, that is not this case.

[9] We also note that even though Mordoh's error as to the amount of the rent increase made the demand and subsequent unlawful detainer action technically defective, he still believed a Costa-Hawkins increase was warranted in the lesser amount, a point also disputed by Bisno.

[10] The advice-of-counsel defense aside, Bisno's reliance on these two issues as dispositive proof that Emmett lacked probable cause is hardly clear cut. As to the first, Costa-Hawkins states that a rent increase is not valid when an occupant who took possession pursuant to the original rental agreement remains in the unit. Jeanette was not named in the lease and it is therefore arguable she was not an occupant who took possession pursuant to the lease. As to

b. *Emmett Disclosed All Relevant Facts*

Bisno contends triable issues of fact exist concerning the advice-of-counsel defense because there is evidence that Emmett did not provide Mordoh with its Bisno tenant file, which included several documents that he believes cast doubt on the validity of any Costa-Hawkins rent increase. The five documents described in Bisno's appellate brief are (1) a key release signed by Jeanette that only tenants could sign; (2) a notice of key release sent by The Shores to the Bisnos; (3) a letter from The Shores to the Bisnos concerning fluids leaking from one of their cars; and (4) and (5) two February 2003 letters from Bisno notifying Emmett that Jeanette intended to occupy the unit as her primary residence.

Mordoh testified at his deposition that he reviewed the tenant file, and stated in a declaration that he got the tenant file from either Boge or Hotch. Hotch said in a declaration that he gave Mordoh a copy of the file. Sherwood testified that he reviewed the contents of the file with Mordoh. However, Bisno contends triable issues of fact exist concerning whether Emmett ever provided Mordoh with the tenant file. He bases this on the following: Boge testified that he was Emmett's point man with Mordoh; Mordoh never asked to see the tenant file and Boge never provided it; the only documents he provided Mordoh were the lease and the hearing officer's report from the rent control hearing; Hotch acted under his instructions; and, to his knowledge, nobody other than he communicated with Mordoh about the matter.

On the last point, however, Boge in fact testified that Hotch was instructed to forward to Boge any documents relating to the Bisno matter. That statement does not preclude Hotch from having sent a copy of the file to Mordoh without Boge's knowledge. Just because Boge was unaware that Hotch had provided Mordoh with a copy does not raise a triable issue of fact that Hotch had not done so.

Bisno also points to the absence of any entries on Mordoh's timesheet showing that he reviewed the file. Mordoh explained, however, that because Emmett was a new client, he did not bill for the time spent reviewing the file, or for certain other matters.

Finally, Bisno relies on a November 2004 letter from Sherwood to Bisno's lawyer, in which Sherwood refused to stipulate to letting Bisno file a first amended complaint that would have let Bisno reinstate his malicious prosecution claim. In discussing the merits of Emmett's Costa-Hawkins claim,

the second, if Emmett waived the prohibition against subletting, then Jeanette would have been a lawful subtenant, thus justifying a rent increase at least to the extent permitted by the lease. (§ 1954.53, subd. (d)(1)–(4).) Mordoh testified at his deposition that he believed Emmett might have treated Jeannette as if she were a lawful subtenant.

Sherwood wrote that before seeking a rent increase under that act, Emmett consulted with Mordoh. "They did not recite the facts of Mr. Bisno's tenancy—they provided him with the decision of the Hearing Examiner [from the rent control hearing]. Based on his review of the Hearing Examiner's decision, Mr. [Mordoh] concluded that the subject rent increase was authorized under Costa[-]Hawkins, and that the underlying unlawful detainer action should be filed if Mr. Bisno failed to pay the increased rent." From this Bisno asserts an inference can be drawn that Mordoh saw no other documents before offering his legal advice. We disagree. At his deposition, Sherwood explained that he meant that the facts which underlay the Costa-Hawkins rent increase and subsequent unlawful detainer action were the same as those recited in the hearing officer's Board decision. When viewed in context, we conclude that Sherwood's statement does not raise an inference that the hearing officer's report was the only document Mordoh reviewed.[11]

However, even if the only document reviewed by Mordoh apart from the lease was the hearing officer's report, we alternatively conclude that the information contained in that report satisfied Emmett's duty of disclosure for purposes of the advice-of-counsel defense. The report sets forth in great detail the testimony of the parties and their witnesses, including a description of various documents that were introduced in evidence. Among these were the January 24, 2002 key release that listed both Bisno and Jeanette as authorizing permanent access for an Esperanza Shearer, along with Boge's statement that only a tenant could authorize such a release; and Boge's testimony acknowledging the August 30, 2001 letter about leaking auto fluids that was addressed to both Bisno and Jeanette. As for the two February 2003 letters from Bisno concerning Jeanette's intention to move in, the report cites Hotch's testimony that during a February 2003 meeting, Bisno might have mentioned that his wife was planning to move in. Therefore, of the five documents mentioned by Bisno in his appellate brief, the only one apparently not referenced during the rent control hearing was the March 2003 key release for delivery of a dishwasher that was signed by only Jeanette. Not only was this cumulative to the evidentiary effect of the other key release, the report mentions another letter that was helpful to Bisno's case—an April 2000 letter from him to Emmett stating that he and Jeanette sought permission to do certain work in *their* unit. When combined with the detailed recitation of each party's evidentiary contentions and legal arguments, we hold that the report by itself disclosed all the relevant facts to Mordoh.

If that were not enough, there is also the undisputed deposition testimony of Sherwood, where he recounts in some detail the many facts and documents he discussed with Mordoh during a meeting on January 22, 2004, before the

---

[11] For instance, it is undisputed that Mordoh reviewed the lease, but that document is not referenced in Sherwood's letter.

three-day notice to pay rent or quit was served. Sherwood said he asked Mordoh if he had reviewed the 60-day rent increase notice and whether there was a valid basis for increasing Bisno's rent under Costa-Hawkins. Mordoh said the notice looked appropriate to him and that he believed there was a valid basis for seeking a rent increase under Costa-Hawkins. Sherwood then recounted the background of "all that had previously gone on in the relationship between Douglas Emmett and Mr. Bisno." Sherwood told Mordoh he was in effect "walking him through and summarizing the tenant file."

Sherwood told Mordoh that Bisno lived in Northern California when he leased the unit, that Bisno did so because he planned to spend more time in Southern California, and that even though the Bisnos were married at that time, Jeanette was not a tenant on the lease. Sherwood summarized the various disputes between the Bisnos and Emmett, including the parking spaces, the time Jeanette was denied access to the unit, and the incident where Jeanette placed a parking sticker on the forehead of an employee at The Shores. Sherwood told Mordoh about the specifics of the rent control hearing, the evidence presented by the Bisnos, and the comment by Bisno's lawyer about the possible applicability of a Costa-Hawkins rent increase. Sherwood told Mordoh about Bisno's February 2003 letters trying to add Jeanette to the lease and the hearing officer's findings. Sherwood then asked Mordoh whether Emmett had a legitimate basis to proceed under Costa-Hawkins. Mordoh said it did, but warned that Bisno would probably not pay the increased rent in February, which would require a notice to pay rent or quit, then an unlawful detainer action.

It is clear from this that Mordoh was apprised of all the relevant facts in Emmett's possession. It is also clear that Sherwood was acting on behalf of Emmett when he disclosed those facts to Mordoh. When combined with the material contained in the Board hearing officer's report, there are no triable issues of fact whether full disclosure to Mordoh took place.[12]

B. *The Litigation Privilege Bars Most of the Two Rent Control Verdicts*

1. *The Rent Control Cause of Action*

a. *Charter Amendments and Procedural Background*

The jury found for Bisno on his claims under C.A. sections 1806 (wrongful eviction) and 1809 (unlawful rent demands) of the Santa Monica rent control

---

[12] Bisno contends that we should reinstate the malicious prosecution cause of action, then enter judgment for him because the jury verdicts on the two rent control causes of action show that he necessarily established all the elements of that claim. We reject this contention because, as we discuss next, we reverse the judgment on the two rent control claims, and because neither of those claims requires proof of the elements of malicious prosecution.

laws. Emmett argues both causes of action are barred by the litigation privilege, and we should reverse.

C.A. section 1806 provides that landlords shall not take actions to terminate a tenancy, including, but not limited to, "making a demand for possession of a rental unit, threatening to terminate a tenancy, serving any notice to quit or other eviction notice or bringing any action to recover possession . . . of a controlled rental unit unless" certain conditions exist. These include the tenant's failure to pay rent, material breach of the lease, creation of a nuisance, holding over after the lease term expires, or refusal to vacate when the landlord seeks in good faith to have the unit occupied by himself or certain family members. The landlord's failure to comply with C.A. section 1806 may be raised as an affirmative defense in an unlawful detainer action, and also gives rise to a cause of action for wrongful eviction, including actual and punitive damages.

C.A. section 1809 provides that any landlord who "demands, accepts, receives, or retains any payment of rent in excess of the maximum lawful rent, in violation of" various city ordinances, rules, or regulations pertaining to rent control, "shall be liable in a civil action to the tenant from whom such payments are demanded . . . ." The tenant is entitled to actual damages based on the amount of the improper demand or receipt of excess rent, attorney's fees and costs, and a civil penalty of treble damages if the landlord acted willfully or with oppression, fraud or malice.

■ Emmett sought leave to amend its answer to assert as an affirmative defense the litigation privilege. Codified at section 47, subdivision (b), the litigation privilege provides that a " 'publication or broadcast' made as part of a 'judicial proceeding' is privileged." (*Action Apartment, supra*, 41 Cal.4th at p. 1241.) The privilege is absolute and applies to all publications no matter how maliciously they were made. (*Ibid.*) The privilege applies to any communication (1) made in judicial or quasi-judicial proceedings, (2) by litigants or other participants authorized by law, (3) to achieve the objects of the litigation, and (4) that has some connection or logical relation to the action. The principal purpose of the litigation privilege is to give litigants and witnesses the utmost access to the courts without fear of being harassed by derivative tort actions. (*Ibid.*) It applies to all tort causes of action except malicious prosecution. (*Id.* at p. 1242.)

Trial court orders on motions to amend pleadings are reviewed for abuse of discretion, but a ruling based on an error of law is an abuse of discretion. We exercise independent review to determine whether legal error occurred. (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159 [84 Cal.Rptr.3d 597, 194 P.3d 330].)

b. *Action Apartment*

In *Action Apartment*, our Supreme Court considered whether the litigation privilege applied to another Santa Monica rent-control-related ordinance. At issue was Santa Monica Municipal Code section 4.56.020, subdivision (i)(1), which prohibits landlords from maliciously serving a notice of eviction or bringing any action to recover possession of a rental unit without a reasonable factual or legal basis. The disputed provision prohibits landlords from taking any "action to terminate any tenancy including service of any notice to quit or other eviction notice or bring any action to recover possession of a rental housing unit based upon facts which the landlord has no reasonable cause to believe to be true or upon a legal theory which is untenable under the facts known to the landlord." (*Ibid.*)

█ Because an unlawful detainer action falls squarely within the litigation privilege, the court held the ordinance was preempted by section 47, subdivision (b) to the extent it applied to the maintenance of such an action. (*Action Apartment, supra,* 41 Cal.4th at pp. 1243–1250.) While a notice of eviction may well have been sufficiently connected to an unlawful detainer action to qualify for the litigation privilege, the court held this was not necessarily so. Instead, the notice presented a factual question as to whether the prelitigation communication relates to litigation that was contemplated in good faith and was under serious consideration. *Action Apartment* thus holds that the litigation privilege may preempt some but not all local ordinances regulating bad faith eviction notices or other prelitigation conduct. (*Id.* at pp. 1251–1252.)

We now apply *Action Apartment* to the present dispute. Bisno testified at trial that his charter amendment causes of action were based on the Costa-Hawkins rent increase demand, the three-day notice to quit, and the unlawful detainer action. We analyze each separately and in reverse order.

Emmett contends that the reasoning and rationale of *Action Apartment* apply to the unlawful detainer here. Bisno counters that *Action Apartment* does not apply here because the jury found all the elements necessary for malicious prosecution except for favorable termination, but insists favorable termination is undisputed because Emmett dismissed the unlawful detainer action. He bases this contention on the *Action Apartment* court's rejection of the city's argument that the bad faith eviction ordinance mirrored a malicious prosecution claim. This appeared to be the city's last and least persuasive argument. In rejecting it, the court noted that the ordinance did not include the element of a favorable termination that is found in malicious prosecution claims. Accordingly, the court declined to address the issue whether a similar ordinance that included that element would be excepted from the litigation

privilege. The court also noted that a tenant who has successfully defended an eviction action may always sue for malicious prosecution. (*Action Apartment, supra*, 41 Cal.4th at p. 1249.)

We reject Bisno's reliance on this dicta, if for no other reason than that although Santa Monica Municipal Code section 4.56.020, subdivision (i)(1) and malicious prosecution claims share some common elements, C.A. sections 1806 and 1809 include *none* of the elements of a malicious prosecution cause of action. They require only that a landlord either brought an unlawful detainer action when the tenant had not committed certain proscribed acts, or the landlord demanded excess rent. Bisno's reliance on the jury's punitive damages verdict and the award of treble damages for the excessive rent demand claim is also misplaced, because those findings do not necessarily correlate to those required for the elements of malicious prosecution. We find the reasoning of *Action Apartment* compelling and conclude that the C.A. section 1806 claim was barred by the litigation privilege to the extent it was based on Emmett's unlawful detainer action.

Bisno next argues that the Supreme Court in *Action Apartment* expressly held the litigation privilege does not necessarily apply to prelitigation conduct, which, he contends, includes C.A. section 1806 eviction notices and C.A. section 1809 excess rent demands. Bisno contends those communications do not qualify for the privilege if the landlord was not in good faith contemplating litigation when he served the eviction notice or made the unlawful rent demand, leaving a factual question for the trier of fact.

At least in the present case, we disagree with Bisno as to the three-day notice to quit, which was a legally required prerequisite to filing the unlawful detainer action. (Code Civ. Proc., §§ 1161, subds. 3, 4, 1162.) Faced with this same issue, the court in *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467 [74 Cal.Rptr.3d 1] (*Feldman*), held that the test was whether the three-day notice was issued when a concomitant unlawful detainer action was contemplated in good faith. That determination does not call into question the merits of the action. Instead, the focus is on whether the unlawful detainer action was seriously contemplated when the notice was served, without regard to its merits or the landlord's motive. Because the three-day notice in *Feldman* was quickly followed up with an unlawful detainer action, and because there was no claim that the notice was made as some hollow threat, the *Feldman* court held that there was no dispute over the connection between the three-day notice and the later unlawful detainer action. (*Id.* at pp. 1486–1488.) The same is true here. Emmett's three-day notice to quit was quickly followed by the unlawful detainer action and Bisno does not contend that the notice was a hollow threat. Accordingly, no reasonable jury could conclude that the three-day notice was not sufficiently

connected to the unlawful detainer action. As a result, the litigation privilege applies to that aspect of Bisno's C.A. section 1806 cause of action as well, and we reverse the judgment on that claim in its entirety.

The same is not necessarily true of Bisno's C.A. section 1809 cause of action based on Emmett's 60-day notice of a Costa-Hawkins demand for increased rent. Although Emmett contends it qualifies as a communication made in anticipation of litigation, it is far more attenuated from the ultimate unlawful detainer action than was the penultimate three-day notice to quit.

First, the 60-day notice requirement applies whenever a landlord demands a rent increase in the amount sought by Emmett, regardless of the reason, unless a different notification period is required by statute. Because Costa-Hawkins does not provide a notice period, the 60-day notice was required. (§ 827, subds. (a), (b)(3), (c).) Second, although the rent increase was sought pursuant to a statute, at heart Costa-Hawkins allows landlords to avoid local rent control ordinances and impose whatever rent they think the market will bear either at the start of a new tenancy or when an existing tenant sublets his unit. The essence of such an arrangement is by far more contractual than statutory, as exemplified by Costa-Hawkins's express preference for any contractually agreed-upon rental rate in the event of a sublease. (§ 1954.53, subd. (d)(1).) Theoretically *any demand* for increased rent could be viewed as a step toward litigation, because it is possible a tenant might refuse to comply, leading the landlord to sue. To apply the litigation privilege to such demands without regard to the factual setting would stretch the privilege to its breaking point. The central issue here is factual, namely, whether litigation was contemplated in good faith and under serious consideration at the time the notice was sent. That issue has never been litigated, so it must be litigated on remand (either through trial or by an appropriate form of pretrial disposition).[13]

Finally, Bisno contends that if *Action Apartment* applies to C.A. sections 1806 and 1809, it should not be applied retroactively. He rests this contention on the principle that an existing rule of law was changed, but the decisions he cites concern landlord notices to vacate so a family member may move in, and do not implicate the litigation privilege. As Emmett points out, the litigation privilege has been in force for many years, and the general rule favors retroactive application of judicial decisions. (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978 [258 Cal.Rptr. 592, 772 P.2d 1059].) We find no bar to applying *Action Apartment* here.

---

[13] Significantly, a notice to increase rent is found in the Civil Code (§ 827); a three-day notice to pay rent or quit, the statutory prerequisite to filing an unlawful detainer proceeding, is in the Code of Civil Procedure. (Code Civ. Proc., §§ 1161, 1162.)

Given the trial court's legal error and the effect it had on the outcome of this action, we believe the trial court abused its discretion in denying Emmett's motion for leave to amend. Bisno contends the order can be affirmed because Emmett was not diligent in bringing the motion. He supports this by pointing out that the motion was brought 10 months after the complaint was filed, after discovery was nearly over, and a trial date had been set. That is not enough. The motion was brought six months before the original trial date, and nearly a year before trial took place. Discovery was still ongoing, the proposed amendment raised primarily a legal issue, and Bisno does not contend that he was prevented from conducting discovery on any factual issues related to the defense. Finally, there is nothing in the record that suggests the trial court denied the amendment because it was untimely.

Based on the foregoing, that part of the judgment dealing with a claim under C.A. section 1806 is reversed with directions that at the end of the case, judgment be entered in favor of Emmett on that cause of action. The judgment under C.A. section 1809 is reversed and may be retried only as to that part of the claim based on the alleged unlawful rent demand. On retrial, the jury is to be instructed on the litigation privilege.

## 2. *The Breach of Contract Verdict Must Stand*

The jury was instructed that, among the things Bisno was required to prove as part of his breach of contract claim, he had to show that he "did all, or substantially all of the significant things that the contract required him to do." In accord with this instruction, the special verdict form asked the jury to determine whether there was a contract between Bisno and Emmett and, if so, whether Bisno did "all, or substantially all, of the significant things that the contract required him to do." The jury answered "yes" to the first question and "no" to the second. As a result, it did not answer the remaining questions concerning whether Emmett breached the lease and whether Bisno was damaged by such breach, and found for Emmett on this cause of action. Bisno brought a motion for partial JNOV on this claim, contending that legal error occurred because any failure to perform under the lease by him was independent of Emmett's covenant to seek a rent increase of no more than $2,000 in the event of a sublease of Bisno's unit. The trial court denied the motion. Bisno contends the trial court erred.

The basis of the jury instruction and its companion special verdict form regarding whether Bisno had performed substantially all the "significant things" he was supposed to is section 1439, which applies to conditions precedent to a contracting party's obligation to perform. According to Bisno, the instruction was not applicable to this case because none of his alleged breaches was a condition precedent to Emmett's contractual obligation to

limit any demand for a rent hike to the $2,000 amount specified by the lease. Assuming for discussion's sake only that Bisno is correct, as set forth below we conclude the issue was waived.

The record shows that Bisno never objected to the instruction or the special verdict form, or requested the court to give other instructions that would clarify or amplify the issue, resulting in a waiver of any objection. (*Shaffer v. Debbas* (1993) 17 Cal.App.4th 33, 47, fn. 3 [21 Cal.Rptr.2d 110] [failure to object to special verdict form that failed to properly quantify damages]; *Jamison v. Lindsay* (1980) 108 Cal.App.3d 223, 232–233 [166 Cal.Rptr. 443] [failure to object to instruction on inapplicable theory].)[14]

### 3. *The Attorney's Fee Order Must Be Reversed*

Both parties made posttrial motions for attorney's fees: Bisno, because he was entitled to such fees under C.A. section 1806 and because he had a net monetary recovery, making him the prevailing party; and Emmett, because it prevailed on the breach of contract claim and the lease provided for its recovery of fees in that case. The trial court denied Emmett's motion and granted Bisno's, awarding Bisno more than $700,000 in attorney's fees.

In addition to affirming the breach of contract verdict, we have reversed the verdict for Bisno under C.A. section 1806, which states that the prevailing party on such a claim shall be entitled to its fees. Remaining is the C.A. section 1809 claim, based on the demand for increased rent. Should Bisno prevail, C.A. section 1809 entitles him to recover attorney's fees. Pending resolution of the C.A. section 1809 cause of action, we reverse the attorney's fee award for Bisno, with the parties free to assert their attorney's fee motions again at that time.

## DISPOSITION

For the reasons set forth above, the order granting summary adjudication of Bisno's malicious prosecution cause of action is affirmed. The judgment is reversed outright as to the C.A. section 1806 cause of action. The judgment on the C.A. section 1809 cause of action is reversed and the matter is remanded for a new trial, with the court to instruct the jury on the litigation

---

[14] Bisno addresses this issue in his reply brief and contends no objection was required because the instruction was erroneous as a matter of law. (Code Civ. Proc., § 647.) He is wrong. The instruction correctly stated the law under section 1439 but, according to Bisno, was inapplicable, requiring some different instruction and verdict form. As the authorities cited above make clear, his failure to object under these circumstances was a waiver.

privilege. The order denying Bisno's motion for partial judgment notwithstanding the verdict on the breach of contract cause of action is affirmed. The order awarding Bisno attorney's fees is reversed, with the parties free to renew their motions pending resolution of the remaining claim on remand. Each party shall bear its own appellate costs.

Mallano, P. J., and Rothschild, J., concurred.