Filed 3/10/15

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DANIEL WILLIAM BEAN, | D064587 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. Nos. 37-2010-00061992-CU-PA-NC & 37-2010-00061759-CL-PO-NC) |
| PACIFIC COAST ELEVATOR CORPORATION, | |
| Defendant and Appellant. | |

APPEAL from an order and a judgment of the Superior Court of San Diego County, Gregory W. Pollack, Judge. Affirmed in part; reversed in part; remanded with directions.

Endemen, Lincoln, Turek & Heater, Kenneth C. Turek; Taylor & Company Law Offices and Joshua R. Benson for Plaintiff and Respondent.

Tucker Ellis & West and Rebecca Ann Lefler for Defendant and Appellant.

---

[*]    Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II. and III.A. through D.

I.

INTRODUCTION

Eric Lazear, an employee of appellant Pacific Coast Elevator Corporation (Pacific Coast), ran his vehicle into appellant Daniel William Bean's truck while Bean was stopped at a red light. Bean suffered serious injuries as a result of the accident and sued Pacific Coast. A jury found Pacific Coast negligent and awarded Bean $1,271,594.74 in damages, including $126,594.74 in economic damages, and $1,145,000 in noneconomic damages. The trial court denied Pacific Coast's motion for new trial, granted Bean's motion for prejudgment interest, and awarded Bean $34,830 in costs. The court entered judgment in the amount of $1,306,424.74 in Bean's favor and ordered prejudgment interest to be calculated on the entire judgment.

On appeal, Pacific Coast contends that the jury's noneconomic damage award is excessive, that the trial court erred in instructing the jury on the basic speed law, and that Bean's counsel committed misconduct during the trial. Pacific Coast further contends that the trial court abused its discretion in finding that Bean's Code of Civil Procedure section 998[1] pretrial offer to settle was reasonable and made in good faith. Finally, Pacific Coast claims that the trial court erred in awarding prejudgment interest on costs.

In the published portion of this opinion, we agree that the trial court erred in awarding prejudgment interest on costs, and in the unpublished portion of this opinion,

_____

1    Unless otherwise specified, all subsequent statutory references are to the Code of Civil Procedure.

we reject the remainder of Pacific Coast's claims.  Accordingly, we reverse the judgment

only insofar as it awards prejudgment interest on costs and remand the matter to the trial

court with directions to recalculate prejudgment interest in a manner consistent with this

opinion, and to enter an amended judgment.   In all other respects, we affirm the

judgment.

## II.

## FACTUAL BACKGROUND[2]

A.   *Lazear's vehicle strikes the rear of Bean's truck while Bean is stopped at a
     red light*

On the morning of Monday, November 24, 2008, Bean was in his truck stopped at

a red light.  Lazear struck the rear of Bean's truck with his vehicle.[3]  Lazear did not see

Bean's truck before the impact.  Lazear explained that he did not see Bean's truck because

"it was [a] very, very bright sunny day," and there was "a lot of glare."

A crew of emergency medical personnel arrived on the scene, placed Bean on a

gurney, and put him in an ambulance.  Bean was in extreme pain during the ride to the

hospital.  Hospital personnel cut off Bean's clothes, performed various imaging tests,

including x-rays, and administered pain treatment.   The hospital discharged Bean later

---

[2]     We state the factual background in the light most favorable to the judgment.  (See,
e.g, *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 642.)

[3]     The parties stipulated that Lazear was acting in the course and scope of his
employment at the time of the accident, and that Pacific Coast was responsible for all
damages for which Lazear was found to be liable.

3

that afternoon.  Bean returned home, and did not return to work until the following Monday.[4]

B.      *Bean undergoes extensive medical treatment for injuries suffered in the accident*

In the days following the accident, Bean had difficulty sleeping, dressing, and using the bathroom.  On two occasions, he wet his bed.

Bean sought treatment for "severe left-sided neck pain" from Dr. Ramin Raiszadeh, an orthopedic spine surgeon.  Dr. Raiszadeh ordered x-rays and an MRI and diagnosed Bean as suffering from severe left-sided neck pain arising from a cervical strain.  Dr. Raiszadeh ordered a long-term course of treatment consisting of physical therapy, chiropractic care, acupuncture, pain medications, and trigger-point injections.[5] Dr. Raiszadeh stated that over the course of his treatment, Bean's pain would wax and wane, but that at times Bean's pain was so intense that Bean "would be in tears" in Dr. Raiszadeh's office, asking Dr. Raiszadeh to "literally cut [his] . . . arm off to get this thing better."  Bean complained to Dr. Raiszadeh that the pain was constant and explained at trial that the pain was forcing him to lead a "[a] dormant lifestyle."

Dr. Raiszadeh referred Bean to Dr. Michael Moon, a board-certified specialist in physical medicine and rehabilitation.  Dr. Moon began treating Bean in September 2009

---

[4]     The accident occurred on the Monday of Thanksgiving week.  Bean therefore missed only three days of work.

[5]     Dr. Raiszadeh stated that trigger point injections involve injections with "local anesthetic that goes into the muscle to decrease the inflammation on that region."

and diagnosed him as suffering from severe neck pain, spasms in the upper trapezius, and limited range-of-motion in the neck. Dr. Moon suspected that Bean's symptoms were caused by damage to his spinal discs and to the facet joints of his spine. Dr. Moon performed a series of steroid injections into Bean's spine. The injections initially provided Bean with some relief from the pain, but the relief was temporary.

Dr. Moon subsequently performed a nerve ablation on Bean's spine, a procedure that destroys nerve endings by burning them with a super-heated needle tip. The first ablation, performed in January 2010, brought about significant pain relief for a period of approximately 10 months. However, according to Dr. Moon, despite the pain relief, Bean's "overall function in activity was quite limited." Bean explained that after receiving the ablation, he attempted to perform some athletic activities, but those activities caused him pain. For example, Bean stated that hitting a baseball caused him to feel as though he had "an ice pick in the back of [his] neck."

Bean visited Dr. Moon in March 2011 and reported pain so severe that it was affecting his ability to work and sleep. Bean also told Dr. Moon that he had gained 50 pounds since the accident due to his reduced physical activity, and he acknowledged to Dr. Moon that he felt depressed because of the uncontrolled pain. Dr. Moon performed a second ablation in March 2011. Bean described the ablation as extremely painful, explaining that he "broke down crying" during the procedure. The second ablation provided less pain relief than had the first.

5

C.      *Bean is involved in a second car accident*

Two weeks after the second ablation, on March 30, 2011, Bean was involved in a second automobile accident. While driving in stop-and-go traffic on the highway, Bean's vehicle was struck from behind by another vehicle. Immediately after this accident, Bean felt extreme pain, similar to the pain he felt after the first accident. Emergency medical personnel arrived on the scene, placed Bean on a board, and transported him to the hospital. Bean remained in the hospital for approximately 24 hours, during which time he received intravenous pain medication every two hours.

D.      *Bean receives additional medical treatment, including spinal surgery*

In response to the second accident, Dr. Raiszadeh ordered additional x-rays and an MRI, which revealed no new or additional damage to Bean's spine. Within weeks, the extreme pain Bean experienced in the wake of the second accident had receded. However, by May 2011, Bean's symptoms began to worsen again. He experienced left-sided neck pain, headaches, and pain in the left arm. Bean was still not able to walk for any distance or play sports. He still had difficulty with daily tasks, such as driving and sleeping. Bean began using more narcotic pain medication and muscle relaxants in the evenings, causing tension within in his family. Bean underwent a third ablation procedure in September 2011, but the procedure provided little pain relief. Bean told Dr. Raiszadeh that he wanted to "figure out a new road to go down," because he was still experiencing significant pain.

In response to Bean's complaints of continuing pain, Dr. Moon performed a discogram on Bean in January 2012, a diagnostic procedure that probes the discs of the

6

spinal column with a specialized needle. Bean screamed out in pain when the needle reached the C3-C4 disc, identifying it as the likely source of his pain. Dr. Raiszadeh examined the results and concluded that Bean's disc had degenerated, causing neck pain, and that the resulting inflammation pinched nearby nerves, causing the numbness in Bean's left arm. Dr. Raiszadeh recommended that Bean undergo a spinal fusion surgery, and Bean consented to the operation. (RT 161, 164, 257, 502-504)

Dr. Raiszadeh performed the fusion operation in April 2012, physically cutting out the C3-C4 disc and installing a plastic cage with a bone graft, connecting screws, and a plate in order to maintain the structure of the spine. Dr. Raiszadeh explained that a cervical fusion is a "delicate surgery" to perform, because the surgeon operates "a millimeter or two" from the spinal cord. Following the operation, Bean wore a neck collar to immobilize his neck for six weeks, entered physical rehabilitation, and did not return to work for approximately six weeks, in order to give the neck bones time to fuse together. Approximately four months after the surgery, Bean reported significant improvement in both his level of pain and mobility. For example, Bean stated that before the surgery, "moving around caused pain to my neck," whereas after the surgery, he was able to walk significant distances.

E.    *Bean continues to suffer some chronic pain and loss of his active lifestyle*

Bean reported significant improvement in his level of pain in the wake of the surgery, with a chronic pain level down to about 1 to 2 on a 10-point scale. However,

some activities still produce significant pain.  For example, driving over a pothole caused sharp pain, like a "lightning rod . . . right through [his] body."

Bean has attempted to "jog a little," but more vigorous running is painful.  For example, Bean testified that since recovering from the surgery, he had attempted to run up two or three set of stairs, and afterward, he felt like, "don't do that again."  Bean also began to perform light weight training, but more serious lifting still caused him pain.  Before the accident, Bean bench-pressed about 250 pounds; since the surgery, he has improved from 40 to 100 pounds.  Bean also explained that he had recently attempted to shoot of couple of free throws with a basketball, but he stopped when he felt a "little pull and tear."

Dr. Raiszadeh described the restrictions on Bean's participation in athletic activities that he would recommend following the surgery as follows:

> "So to prevent any other surgery . . . you want to prevent any axial loading.  So . . . the more pressure you put on the spine, the more likely you're going to potentially put stressors above it or below it.  So . . . common sense, again you have neck surgery, you don't want to go in there and play football or, you know, run around.  I wouldn't run.  I would use the elliptical machine.  I would do swimming as compared to running.  You know, you bike rather than doing heavy lifting.  Do what you need to do, but be sensible because again it's never the way it was initially intended to be."

Bean also presented considerable evidence that limitations on his ability to perform athletic activities such as basketball, water sports, and offroading, have altered his lifestyle and have negatively impacted his friendships.  Bean's friends testified that they have

8

noticed that he continues to decline invitations to participate in such activities due to his physical limitations.

In addition to evidence related to limitations of his athletic endeavors, Bean also presented evidence that he continues to be restricted in his ability to physically care for his aging mother, and to perform yard and construction work around his house. Bean also presented evidence of fears concerning his future employability, given the injuries that he has suffered.

Finally, because the fusion surgery increased the pressure on the neighboring discs in Bean's cervical column, there is a 40 to 60 percent chance that Bean will need a second fusion surgery in the next 20 years.

III.

DISCUSSION

A.     *Pacific Coast is not entitled to reversal of the jury's noneconomic damage award*

Pacific Coast contends that the jury's noneconomic damage award is excessive in that it is not supported by substantial evidence, shocks the conscience, and is improperly punitive.

1.     *Factual and procedural background*

By way of a special verdict, the jury awarded Bean a total of $1,271,594.74 in damages. The jury awarded Bean $48,601.01 in medical expenses following the first accident and $77,993.73 in medical expenses and lost earnings following the second

9

accident.[6]  The jury also awarded Bean $200,000 in noneconomic damages for the time period between the first and second accidents, $120,000 in noneconomic for the time between the second accident and the verdict, and $825,000 in future noneconomic damages.

After the jury returned its verdict, Pacific Coast filed a motion for a new trial in which it contended that the jury's damages award was excessive and unsupported, contending that Bean's "injuries were relatively minor and have resolved."  Pacific Coast also argued that misconduct on the part of Bean's counsel had contributed to the excessive award, and also constituted an independent basis for granting a new trial.  In the alternative, Pacific Coast requested that the court issue a remittitur to reduce the noneconomic damages component of the award.

Bean filed an opposition in which he argued that the jury's damages award was not excessive and was supported by the evidence of Bean's serious injuries and his loss of enjoyment of life.  Bean also contended that his counsel had not committed misconduct during the trial, and noted that Pacific Coast had failed to object during the trial to any purported misconduct.

After further briefing, the trial court held a hearing on the motion.  After hearing argument from counsel, the trial court denied the motion.  The court reasoned in part:

6    The parties stipulated that Bean incurred $48,601.01 in medical expenses related to the first accident and that the jury was to determine what portion of the $103,993 in medical expenses, which were incurred following the second accident, were attributable to the first accident.  The parties also stipulated that Bean had lost $7,426 in wages following his neck surgery in April 2012.

10

"If this was purely a pain case for the future, then you might say that 800-plus in future noneconomic damages . . . was too great because I think his testimony was his pain is about a 2 [on a scale of 1 to 10] nowadays. That's kind of what I recall. But the appealing thing about . . . his claim for noneconomic damages is what he had to give up, what he has to give up in the future in terms of his . . . lifestyle. Here was a very athletic, active guy who could no longer do the things he used to be able to do. It's that loss as opposed to whether he's having acute pain or not."

2.      *Governing law*

Well-settled principles of law govern our circumscribed scope of review of a jury's damage award after a trial court's denial of a motion for new trial premised on a claim of excessive damages:[7]

> " 'The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.' " (*Izell v. Union Carbide Corporation* (2014) 231 Cal.App.4th 962, 978-979.)

With respect to noneconomic damages, "a plaintiff may recover not only for physical pain but for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal." (*Capelouto v.*

---

7      In order to raise a claim of excessive damages on appeal, an appellant must first raise the issue in a motion for new trial. (See *Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 918  [" 'The point that damages are excessive cannot be raised for the first time on appeal, but must be presented to the lower court on the motion for new trial' "].)

11

*Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892-893 (*Capelouto*); accord Civ. Code, § 1431.2, subd. (b)(2) ["For the purposes of this section, the term 'non-economic damages' means subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation"].)  "[A] pain and suffering award may include compensation for the plaintiff's loss of enjoyment of life." (*Loth v. Truck-A-Way Corp*. (1998) 60 Cal.App.4th 757, 763.)

Given the nature of such damages, "[t]he amount of noneconomic damages to award for pain and suffering is a subjective determination that is particularly within the discretion of the jury." (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1416 (*Rayii*); see also *Capelouto*, *supra*, 7 Cal.3d at p. 893 [noneconomic damages "represent[] a detriment which can be translated into monetary loss only with great difficulty," and "the issue generally must be resolved by the 'impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence' "].)

3.     *Application*

Pacific Coast contends that the jury's noneconomic damage award is not supported by substantial evidence, arguing that the accident was "minor," and that Bean is "not in pain, has no major life limitations, and there was no dispute that he had almost fully recovered prior to the second accident in which [Pacific Coast] played no role."  We disagree.  The record demonstrates that the accident caused major injuries to Bean that required extensive medical treatment, including a spinal fusion surgery, a discogram,

12

several radiofrequency ablations, and several spinal injections. Bean also attended more than 100 acupuncture appointments, as well as numerous appointments with his chiropractor, physical therapist, and orthopedic surgeon. In addition, the record contains substantial evidence that Bean suffered extreme pain and that he continues to suffer some chronic pain. The record also contains evidence that Bean can no longer participate in vigorous athletic activities, which has caused Bean to suffer a significant loss of enjoyment of life. Further, Bean presented expert testimony that the accident for which the jury found Pacific Coast liable was responsible for 90 percent of Bean's physical condition after the second accident. In sum, there is substantial evidence to support the jury's award of noneconomic damages.

We are not persuaded by Pacific Coast's contention that the noneconomic damages award shocks the conscience. In support of this contention, Pacific Coast compares the noneconomic damages award in this case with verdicts from two other cases—*Mendoza v. Club Car, Inc.* (2000) 81 Cal.App.4th 287 (*Mendoza*) and *Luttrell v. Island Pacific Supermarkets, Inc.* (2013) 215 Cal.App.4th 196, 203. Pacific Coast provides a single sentence description about the nature of the injuries in each case—*Mendoza* (fractured vertebrae and spinal cord injury) and *Luttrell* (fractured hip requiring surgery)—and contends that the smaller verdicts ($1 million in noneconomic damages in *Mendoza* and $40,000 in noneconomic damages in *Luttrell*) demonstrate that the jury's noneconomic

13

damages award in this case was excessive. (*Mendoza, supra*, at p. 301; *Lutrell, supra*, at p. 203.)[8]

"While a reviewing court, in passing upon [a claim of excessive damages], may consider amounts awarded in similar cases [citation], in the final analysis the question in each case must be determined from its own peculiar facts and circumstances [citation], and it cannot be held as a matter of law that a verdict is excessive simply because the amount may be larger than is ordinarily allowed in such cases." (*Daggett, supra,* 48 Cal.2d at p. 666.) We acknowledge that the jury awarded a significant amount of noneconomic damages, and that, in particular, its award of $825,000 for future noneconomic damages may be viewed as on the "high-end" of reasonable damages in

[8]     Pacific Coast also filed a motion for judicial notice, requesting that this court take judicial notice of various "printouts from WestlawNext's database of jury verdicts and settlements, showing verdict amounts from trials involving car accidents and injuries similar to the accident and injuries in this case." Pacific Coast notes that, pursuant to Evidence Code section 459, this court may take judicial notice of the official acts of the judicial department of any state (*id*., § 452, subd. (c)), records of any California court (*id*., subd. (e)), and facts that are "capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy" (*id*., subd. (h)).
     Even though a reviewing court may "consider amounts awarded in similar cases" when determining whether an award is excessive (*Daggett v. Atchison, T. & S. F. Ry. Co.* (1957) 48 Cal.2d 655, 666 (*Daggett*)), the only basis for determining whether the cases referred to in Pacific Coast's motion are "similar" to this case, are the short (generally less a page in length) summaries of the cases contained in the WestlawNext's database. Judicial notice may not be taken of such summaries for purposes of determining the factual similarity of such cases with this case because doing so would require taking judicial notice of the truth of the contents of such documents, which is improper. (See e.g., *Hill v. San Jose Family Housing Partners, LLC* (2011) 198 Cal.App.4th 764, 770 [courts may "take judicial notice only that the document exists, not of the truth of its contents"].) Accordingly, we deny Pacific Coast's request for judicial notice.

14

light of Bean's largely successful recovery from his surgery. (*Izell v. Union Carbide Corporation, supra*, 231 Cal.App.4th at p. 981; see *ibid*. [stating that amount on noneconomic damages was on the "high-end" but that "this alone is not sufficient to second-guess the trial judge, who presided over the four-week trial and personally observed 'the injury and the impairment that has resulted' "].)  However, in light of the subjective nature of such damages, the seriousness of Bean's injuries, and the considerable evidence of Bean's loss of enjoyment of life, combined with his lengthy expected life span (36 years),[9] we cannot conclude that the "the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Id*. at p. 979.)

Finally, Pacific Coast contends that the "noneconomic damages are so excessive they likely include a punitive component."  However, Pacific Coast points to no evidence that the jury's award contains a punitive component.  Further, Pacific Coast's only argument in support of this contention is that Bean's counsel's committed purported misconduct that likely "inflame[d] the passion and prejudice of the jury," including comments about "Lazear endangering the community's children [and Pacific Coast being] a bad corporate actor."  As discussed in detail with respect to Pacific Coast's separate attorney misconduct claim (see pt. III.C., *post*), Pacific Coast failed to raise a single objection to any such purported misconduct at trial.  Further, after a review of the trial

---

9    The trial court instructed the jury that if it were to decide that Bean had suffered damages that would continue for the rest of his life, the jury should take into account that Bean's life expectancy was 36.1 years.

15

transcript, we conclude that none of Bean's counsel's purported misconduct demonstrates that the jury's award of noneconomic economic damages contains a punitive component.

Accordingly, we conclude that Pacific Coast is not entitled to reversal of the jury's noneconomic damage award.

B.      *Pacific Coast failed to preserve its claim that there was not substantial evidence to support instructing the jury on the basic speed law*

Pacific Coast contends that the trial court erred in providing the jury with two instructions premised on the basic speed law because the record lacks substantial evidence to support giving these instructions.  Specifically, Pacific Coast contends that the trial court erred in instructing the jury on the basic speed law because "there was no evidence (1) of Mr. Lazear's speed, (2) that speed was a cause of the accident, or (3) that a change in speed would have avoided it."

1.      *Governing law*

A party may not complain on appeal that a trial court improperly instructed the jury on an "inapplicable theory" absent a specific objection in the trial court.  (*Bisno v. Douglas Emmett Realty Fund 1988* (2009) 174 Cal.App.4th 1534, 1555 (*Bisno*) citing *Jamison v. Lindsay* (1980) 108 Cal.App.3d 223, 232–233.)

In *Bisno*, appellant contended that, with respect to his breach of contract claim, the trial court erred in instructing the jury that he was required "to show that he 'did all, or substantially all of the significant things that the contract required him to do.' "  (*Bisno, supra*, 174 Cal.App.4th at p. 1554.)  According to the appellant, "the instruction was not

16

applicable to this case because none of his alleged breaches was a condition precedent" to respondent's contractual obligation on which appellant's breach of contract claim was based. (*Id*. at pp. 1554-1555.)

The *Bisno* court concluded that, even assuming appellant was correct that the instruction was inapplicable in light of the evidence presented at trial, his claim was forfeited. The *Bisno* court reasoned in part, "The instruction correctly stated the law . . . but, according to [appellant], was inapplicable, requiring some different instruction . . . . As the authorities cited above [including *Jamison, supra,* 108 Cal.App.3d at pp. 232-233] make clear, his failure to object under these circumstances was a waiver." (*Bisno, supra*, 174 Cal.App.4th at p. 1555, fn. 14; see also *Jamison, supra*, at p. 233 [agreeing that "instruction was not applicable to the present case" in light of evidence presented at trial, but concluding that appellant forfeited claim that court erred in providing instruction by failing to object to instruction in trial court].)

2.    *Factual and procedural background*

During a jury instruction conference, Bean's counsel provided the court with a modified instruction on negligence per se (CACI No. 418), premised on the basic speed law:

> "[Bean's counsel]: Your honor, I'm now handing to the bailiff deputy the negligence per se instruction and I believe we did give a copy to counsel.
>
> "[¶] . . . [¶]

17

"[Pacific Coast's counsel]: And I guess I would ask you about this now all the evidence is near [*sic*] and I don't—I could be wrong, but I don't recall a Vehicle Code violation section being talked about.

"The court: Well, it doesn't have to be. The court determines what the law is. They don't have to call up a CHP [California Highway Patrol officer] right over here that says by the way Vehicle Code Section 22350[10] states.

"[Bean's counsel]: And the reason we raised this is . . . counsel and the court indicated that visibility is going to be their defense.

"The court: Yeah.

"[Bean's counsel]: Couldn't see.

"The court: That's the only one I heard of.

"[Bean's counsel]: Right. The glare got in my eye—and my point is that—well, I think it's obvious what my point is. You got a problem with glare, you do something about it."

"The court: Yeah.

"[Bean's counsel]: Including slowing down."

Shortly thereafter, Pacific Coast's counsel raised the following objection to the

giving of a pattern instruction (CACI No. 706) outlining the basic speed law:

"The court: . . . Are you objecting to [CACI No. ] 706?

"[Pacific Coast]: I am, because I think it is just duplicative to [CACI No.] 418. You're saying the same thing twice basically.

---

10    Vehicle Code section 22350, which recites the basic speed law, provides: "No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property."

18

"The court: All right.  So we have an objection.  By my account, that's the first objection to any instruction, right? So far, everything's been agreed upon?"

"[Bean's counsel]: Yes, your honor.

"[Pacific Coast's Counsel]: I think we—yes."

The trial court overruled Pacific Coast's objection.[11]

Upon the jury's return to the courtroom, the court instructed the jury pursuant to CACI No. 706, stating:

> "A person must drive at a reasonable speed.  Whether a particular speed is reasonable depends on the circumstances, such as traffic, weather, visibility and road conditions.  Drivers must not drive so fast that they create a danger to people or property.  If . . . Bean has proved that Pacific Coast . . . was not driving at a reasonable speed at the time of the accident, then Pacific Coast . . . was negligent."

The court also instructed the jury pursuant to a modified version of CACI No. 418.

CACI No. 418 referred to the basic speed law and then stated in part: "If you decide that Pacific Coast . . . violated this law and that the violation was a substantial factor in bringing about the harm, then you must find that Pacific Coast . . . was negligent."

3.    *Application*

In the trial court, Pacific Coast did not object to either jury instruction concerning the basic speed law (CACI No. 418 or CACI No. 706) on the ground there was insufficient evidence introduced at trial to support the giving of the instructions. Accordingly, Pacific Coast's claim that the trial court erred in instructing on this

---

11    The trial court overruled the objection prior to the colloquy quoted above.  We quote the colloquy because it summarizes Pacific Coast's objection to CACI No. 706.

19

purportedly "inapplicable theory" is forfeited. (*Bisno, supra,* 174 Cal.App.4th at p. 1555.)

Pacific Coast contends that it sufficiently preserved its appellate claim because its trial counsel remarked during the jury instruction conference, "I could be wrong, but I don't recall a Vehicle Code violation section being talked about." We are not persuaded. We interpret counsel's remark as the trial court did, as merely questioning whether Bean was required to have presented evidence to the jury regarding the statute on which its requested instruction was based. When the court responded to counsel's remark by stating that Bean was not required to present the testimony of a police officer concerning the applicable Vehicle Code statute, Pacific Coast's counsel did not contend that the trial court had misunderstood her comment, nor did Pacific Coast's counsel raise *any* of the arguments that Pacific Coast raises in support of its claim on appeal concerning the purported lack of substantial evidence to support the giving of the instruction. In addition, later in the proceedings, when Bean's counsel discussed the evidence that he contended supported the instruction, Pacific Coast's counsel raised no objection. Further, when Pacific Coast's counsel objected to CACI No. 706 on the ground that it was duplicative of CACI No. 418,[12] counsel expressly agreed with the trial court that her objection to CACI No. 706 was "the first objection to any instruction." Counsel made this concession notwithstanding the fact that the discussion of CACI No. 418 on which

_____

[12]   Pacific Coast does not contend on appeal that CACI No. 706 was duplicative of CACI No. 418.

20

Pacific Coast contends that it preserved its appellate claim had occurred, according to Pacific Coast, just "moments before."[13]

Accordingly, we conclude that Pacific Coast failed to preserve its contention that there was not substantial evidence to support instructing the jury on the basic speed law.[14]

C.    *Pacific Coast is not entitled to a new trial on the ground that Bean's trial counsel committed misconduct*

Pacific Coast claims that it is entitled to a new trial on the ground that Bean's trial counsel committed misconduct during the trial.

1.    *Governing law*

Attorney misconduct is a ground for a new trial.  (See, e.g., *Rayii, supra,* 218 Cal.App.4th at p. 1411.)  However, it is well established that a party ordinarily cannot prevail on a claim of attorney misconduct on appeal absent both an objection in the trial court and a request that the jury be admonished:

> "A party ordinarily cannot complain on appeal of attorney misconduct at trial unless the party timely objected to the misconduct and requested that the jury be admonished.  [Citation.] The purpose of these requirements is to allow the trial court an opportunity to remedy the misconduct and avoid the necessity of a retrial; a timely objection may prevent further misconduct, and an

---

13    In the reporter's transcript, the discussion of CACI No. 706 begins two pages after the discussion of CACI No. 418 concludes.

14    In light of our conclusion that Pacific Coast failed to preserve its claim, we express no opinion on the merits of Pacific Coast's contention that the instructions were improper.

21

admonition to the jury to disregard the offending matter may eliminate the potential prejudice.  [Citations.]  The failure to timely object and request an admonition waives a claim of error unless the misconduct was so prejudicial that it could not be cured by an admonition [citations], an objection or request for admonition would have been futile [citation] or the court promptly overruled an objection and the objecting party had no opportunity to request an admonition [citation].  Attorney misconduct is incurable only in extreme cases." (*Id*. at p. 1411-1412.)

2.     *Application*

Although Pacific Coast contends on appeal that it was subjected to "pervasive [attorney] misconduct throughout [the] trial" that was "highly prejudicial," it fails to point to a single instance in which it objected to such purported misconduct.  Thus, Pacific Coast can prevail on its attorney misconduct claim on appeal only if it can demonstrate that the "misconduct was so prejudicial that it could not be cured by an admonition." (*Rayii*, *supra*, 218 Cal.App.4th at p. 1412.)[15]  A review of the purported misconduct of which Pacific Coast complains reveals no such incurable misconduct.

First, Pacific Coast contends that Bean's trial counsel "leveraged the trial court's instructional error by using the basic-speed-law to paint the case as involving wanton recklessness that endangered the community as a whole."  For example, Pacific Coast noted that Bean's counsel stated the following during closing argument:

"This case isn't just a mere fender bender as some people have said.  This case involves a very important principle . . . you're going to hear about . . . called the basic speed law.  It is a safety rule that's on

_____

15     Pacific Coast does not contend that an objection or request for admonition would have been futile.

22

the books that protects everyone in the community.  There has been,
we have proven, a violation of that basic safety law."

Pacific Coast also notes that Bean's counsel stated the following during his rebuttal

closing argument, "This case is important because it is [*sic*] for the enforcement of an

important safety rule that's written.  The basic speed law is an important safety rule that

protects everyone in the community."

We concluded in part III.B., *ante*, that Pacific Coast failed to preserve its

contention that the trial court erred in instructing on the basic speed law, and we see

nothing improper in Bean's counsel's unobjected-to references to the basic speed law

during the trial.  (See, e.g., *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 795

(*Cassim*) [" ' "Counsel may vigorously argue his case and is not limited to

'Chesterfieldian politeness.' "  [Citations.]  "An attorney is permitted to argue all

reasonable inferences from the evidence . . . ."  [Citation.]  "Only the most persuasive

reasons justify handcuffing attorneys in the exercise of their advocacy within the bounds

of propriety."  [Citation.]' "].)

Pacific Coast also contends that Bean's counsel committed misconduct by

"emphasizing the fact that the accident occurred in a school zone, despite the lack of

evidence that any children or pedestrians were ever in danger."  We are aware of no

authority, and Pacific Coast cites none, that suggests that Bean was required to offer

evidence that children or pedestrians were present near the scene of the accident in order

for his counsel to be permitted to refer to the undisputed fact that the accident occurred in

23

a school zone.  Bean's counsel did not commit flagrant and incurable misconduct by noting that the accident occurred in a school zone.

Pacific Coast also contends that Bean's trial counsel improperly "portray[ed] [Pacific Coast] as a bad corporate actor that facilitated recklessness," noting that Bean's counsel stated the following during his closing argument:

> "There's a corporate decision that has been made to say what happened here is okay.  That's the position they're taking in this courtroom and counsel's going to argue in a moment that that's okay."

Even assuming that this stray remark was improper, any impropriety plainly could have been cured by admonishment and does not constitute reversible error.

Finally, Pacific Coast contends that Bean's counsel committed misconduct during his closing argument by suggesting that one manner of determining the proper amount of noneconomic damages to award would be to imagine a "want ad" that stated in part, "Wanted: athletic, vibrant, man in his late 30s who through no fault of his own must be willing to endure sudden and continuing chronic pain and injury which damages him mentally and physically for the rest of his life."  Bean's counsel continued describing a hypothetical "want ad" by reviewing evidence of Bean's injuries as being those that a hypothetical applicant would have to be willing to endure.[16]  Pacific Coast notes that the

---

16     Pacific Coast contends that Bean's counsel improperly suggested that a person hired to perform such a job should be compensated at $8 an hour, and, after noting Bean's 36-year life expectancy, asked the jury to award $756, 864 in future noneconomic damages.  Bean's counsel's suggestion of a possible method of determining the amount of noneconomic damages to award was a *separate* argument, made after a recess without

24

Court of Appeal in *Collins v. Union Pacific Railroad Co.* (2012) 207 Cal.App.4th 867, concluded that a similar argument was an improper "golden rule" argument. (See *id*. at p. 883 ["Counsel's 'surrogate victim' argument was a 'golden rule' argument. A 'golden rule' argument is one where counsel asks the jury to place itself in the victim's shoes and award such damages as they would charge to undergo equivalent pain and suffering"].) Even assuming that we were to agree with the *Collins* court that such an argument is improper,[17] because Pacific Coast's trial counsel failed to make a timely objection at trial, any "such error [is] considered forfeited" on appeal. (*Ibid.*)

Accordingly, we conclude that Pacific Coast is not entitled to a new trial on the ground that Bean's trial counsel committed misconduct.

---

reference to the earlier "want ad" argument. This latter argument was a so called "per diem argument" in which counsel "ask[ed] the jury to measure the plaintiff's pain and suffering on a 'per diem' basis." (*Loth v. Truck-A-Way Corp.*, *supra*, 60 Cal.App.4th at p. 765, fn. 8.)

Per diem arguments generally are proper. (See *Beagle v. Vasold* (1966) 65 Cal.2d 166, 182, fn. 11 ["counsel may properly suggest to the jury that plaintiff's pain and suffering may be measured on a 'per diem' basis"].) While Pacific Coast suggested in its *reply* brief that Bean's counsel's per diem argument was improper, it failed to distinctly raise this claim in its opening brief, or to explain why it raised the claim for the first time in reply. Accordingly, Pacific Coast's contention as to Bean's per diem argument is forfeited. (See *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 801 [claims raised for first time in reply are forfeited unless good reason has been shown for failure to raise them earlier].)

[17]    We need not, and do not, decide whether such an argument is improper.

D.	*The trial court did not abuse its discretion in finding that Bean's section 998 pretrial offer to settle was reasonable and made in good faith*

Pacific Coast contends that the trial court erred in awarding Bean prejudgment interest and costs pursuant to Civil Code section 3291 and Code of Civil Procedure section 998.  Specifically, Pacific Coast claims that the court abused its discretion in finding that Bean's section 998 pretrial offer to settle was reasonable and made in good faith.

1.	*Governing law and standard of review*

"Section 998 authorizes any party to make a statutory offer to settle an action by allowing a judgment or dismissal to be entered based on the offer's terms and conditions. (§ 998, subd. (b).)  The statute seeks to encourage settlement by providing parties a financial incentive to make and accept reasonable settlement offers before trial." (*Rouland v. Pacific Specialty Ins. Co.* (2013) 220 Cal.App.4th 280, 284.)  "If a defendant does not accept a plaintiff's section 998 offer and thereafter fails to obtain a more favorable judgment, (1) the trial court may, in its discretion, require the defendant to pay the reasonable postoffer expert witness fees that the plaintiff incurred in preparing for trial and at trial (§ 998, subd. (d)), and (2) the judgment against the defendant in any personal injury action shall accrue prejudgment interest at the rate of 10 percent per annum from the date of the offer (Civ. Code, § 3291)." (*Rouland, supra,* at pp. 284-285.)

26

"To effectuate the purpose of the statute, a section 998 offer must be made in good faith to be valid. [Citation.]" (*Whatley-Miller v. Cooper* (2013) 212 Cal.App.4th 1103, 1112.) The *Whatley-Miller* court outlined the meaning of "good faith" in this context:

> " 'Good faith requires that the pretrial offer of settlement be "realistically reasonable under the circumstances of the particular case. . . ." [Citation.] The offer "must carry with it some reasonable prospect of acceptance. [Citation.]" [Citation.]' [Citation.] [¶] Whether the offer is reasonable 'depends upon the information available to the parties as of the date the offer was served.' [Citation.] Reasonableness generally 'is measured, first, by determining whether the offer represents a reasonable prediction of the amount of money, if any, defendant would have to pay plaintiff following a trial, discounted by an appropriate factor for receipt of money by plaintiff before trial, all premised upon information that was known or reasonably should have been known to the defendant,' and '[i]f an experienced attorney or judge, standing in defendant's shoes, would place the prediction within a range of reasonably possible results, the prediction is reasonable.' [Citation.] [¶] 'If the offer is found reasonable by the first test, it must then satisfy a second test: whether [plaintiff's] information was known or reasonably should have been known to [defendant]. This second test is necessary because the section 998 mechanism works only where the offeree has reason to know the offer is a reasonable one. If the offeree has no reason to know the offer is reasonable, then the offeree cannot be expected to accept the offer.' [Citation.]" (*Whatley-Miller, supra,* at pp. 1112-1113.)

" '[W]hen a party obtains a judgment more favorable than its pretrial offer, it is presumed to have been reasonable and the opposing party bears the burden of showing otherwise.' " (*Arno v. Helinet Corp.* (2005) 130 Cal.App.4th 1019, 1025.) In addition, "[w]hether a section 998 offer was reasonable and made in good faith is a matter left to the sound discretion of the trial court, and will not be reversed on appeal except for a clear abuse of discretion." (*Barba v. Perez* (2008) 166 Cal.App.4th 444, 450.)

27

2.    *Factual and procedural background*

After the jury rendered its verdict, Bean filed a motion for prejudgment interest, and a separate memorandum of costs in which he sought to recover various costs, including expert witness fees.  In his motion for prejudgment interest, Bean noted that in August 2012, he served Pacific Coast with a section 998 offer to settle the case for the amount of $999,999, that Pacific Coast had never accepted the offer, and that the jury rendered a verdict in his favor in the amount of $1,271,594.74.[18]

In its opposition to Bean's motion for prejudgment interest, Pacific Coast contended that Bean's section 998 offer was not made in good faith.  Specifically, Pacific Coast contended "[Bean's] doctors' billing in this case was grossly inaccurate, and as a result [Pacific Coast] could not accurately assess the damages in this case at the time the Section 998 offer was made."  Pacific Coast raised the same argument in a motion to tax costs.

After further briefing, the trial court held a hearing on the various motions.  At the hearing, the court observed that the reasonableness of Bean's medical bills was contested before trial, stating, "In a hotly contested piece of litigation, they were claiming medical bills probably something in the neighborhood of, what, about 200 [thousand]?  Turned out it was 150 [thousand].  Is that about what it was?"  Pacific's Coast's counsel responded, "I believe so."  In addition, the trial court suggested that Pacific Coast had the

---

[18]    Bean also lodged a copy of his section 998 offer to compromise along with his memorandum of costs.

28

"underlying information" on which it could have determined the reasonable dollar amount for the services rendered. Further, the court observed that to the extent Pacific Coast believed that the medical bills were inflated, Bean would have "erred on the side of making [his section] 998 [offer of $999,999] appear to the defense to be more reasonable than it was." The court continued:

> "Well, the court finds it was made in good faith. It was a very accurate 998, if you think about it. It's for a million dollars. The jury came in at $1.271 million. It was . . . really spot on."

After the hearing, the trial court entered an order finding that Bean's section 998 offer to compromise was made in good faith, and that Bean was entitled to recover prejudgment interest and expert witness fees.

3.      *Application*

Pacific Coast contends that the trial court applied the "wrong test" and "disregarded" the second prong of the good faith test (i.e. whether Pacific Coast knew or reasonably should have known the information that Bean possessed in making the section 998 offer). In support of this contention, Pacific Coast argues that at the time of the section 998 offer, "[Bean's] claimed medical damages were grossly inflated."

We reject this argument. Pacific Coast fails to demonstrate that the trial court abused its discretion in determining that Pacific Coast possessed all of the information necessary to determine the reasonableness of the dollar amount of Bean's medical expenses. Pacific Coast has also failed to make any showing that, to the extent it lacked information to evaluate the offer, it took any steps to gain such information, or that it

29

asked for more time to evaluate the offer. Further, given that the disputed medical expenses were only a small component of the damages claimed by Bean, the trial court did not abuse its discretion in finding that Pacific Coast had sufficient information to determine whether Bean's section 998 offer was reasonable.

Pacific Coast also contends that the trial court abused its discretion in finding that the section 998 offer was made in good faith because there "was no basis for concluding that the offer was reasonable." In support of this argument, Pacific Coast contends that Bean's million-dollar offer was not reasonable, given that the accident was merely "a minor fender-bender . . . ." We are unpersuaded. In light of the evidence of the seriousness of Bean's injuries that Pacific Coast possessed at the time of the offer, the trial court did not abuse its discretion in finding that the offer was reasonable.[19]

Accordingly, we conclude that the trial court did not abuse its discretion finding that Bean's section 998 pretrial offer to settle was reasonable and made in good faith, or in determining that Bean was entitled to an award of prejudgment interest and costs.

E.      *The trial court erred in awarding prejudgment interest on costs*

Pacific Coast contends that the trial court erred in awarding prejudgment interest on Bean's *costs*. Pacific Coast contends that, pursuant to Civil Code section 3291, prejudgment interest should have been awarded only on the *damages* that the jury

---

[19]     Pacific Coast also reiterates its argument concerning Bean's inflated medical bills in contending that Bean's section 998 offer was unreasonable. We reject that argument for the reasons stated in the text with respect to Pacific Coast's argument that it lacked sufficient information to evaluate the reasonableness of the section 998 offer.

awarded in its verdict. Because Pacific Coast's contention raises a question of statutory interpretation, we apply the de novo standard of review. (See, e.g., *Doe v. Brown* (2009) 177 Cal.App.4th 408, 417 (*Doe*).)

      1.      *Principles of statutory interpretation*

In *Doe, supra*, 177 Cal.App.4th at page 417, we explained that statutory interpretation begins with an examination of the text of a statute:

> " 'In construing any statute, "[w]ell-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law." [Citation.] "We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context." [Citation.] If the statutory language is unambiguous, "we presume the Legislature meant what it said, and the plain meaning of the statute governs." [Citation.]' [Citation.]"

The *Doe* court also explained the principles of interpretation to be applied when considering a textually ambiguous statute:

> " 'If . . . the statutory language is ambiguous or reasonably susceptible to more than one interpretation, we will "examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes," and we can " ' "look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' " [Citation.]' [Citation.]
>
> " ' "We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an

interpretation that would lead to absurd consequences."  [Citation.]'
[Citation.]  Further, 'We presume that the Legislature, when enacting
a statute, was aware of existing related laws and intended to
maintain a consistent body of rules.  [Citation.]' [Citation.]"  (*Doe*,
*supra*, 177 Cal.App.4th at pp. 417-418.)

2.      *Civil Code section 3291*

Civil Code section 3291 provides in relevant part:

> "In any action brought to recover damages for personal injury
> sustained by any person resulting from or occasioned by the tort of
> any other person, corporation, association, or partnership, whether
> by negligence or by willful intent of the other person, corporation,
> association, or partnership, and whether the injury was fatal or
> otherwise, it is lawful for the plaintiff in the complaint to claim
> interest on the damages alleged as provided in this section.

> "If the plaintiff makes an offer pursuant to Section 998 of the Code
> of Civil Procedure which the defendant does not accept prior to trial
> or within 30 days, whichever occurs first, and the plaintiff obtains a
> more favorable judgment, the judgment shall bear interest at the
> legal rate of 10 percent per annum calculated from the date of the
> plaintiff's first offer pursuant to Section 998 of the Code of Civil
> Procedure which is exceeded by the judgment, and interest shall
> accrue until the satisfaction of judgment."

3.      *Relevant case law*

In *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644 (*Lakin*), the

Supreme Court considered whether a party may recover prejudgment interest pursuant to

Civil Code section 3291 on that portion of a jury's award attributable to damages other

than for personal injury.  The *Lakin* court concluded that "[Civil Code] section

3291 . . . authorizes 'prejudgment interest only for the personal injury portion of a more

general total recovery.' "   (*Lakin, supra*, at p. 658.)  In reaching this conclusion, the

32

*Lakin* court acknowledged that the second paragraph of Civil Code section 3291 could be read to suggest that prejudgment interest is to be awarded even on those components of a judgment that are not for personal injury damages:

> "The statute in issue is not a model of clarity. Its second paragraph provides that if the plaintiff makes a pretrial offer to compromise that is not accepted and then 'obtains a more favorable judgment, the *judgment* shall bear interest . . .' ([Civ. Code,] § 3291, italics added). Taken literally, this language requires a court to assess prejudgment interest on an entire judgment regardless of how much or how little of the award consisted of personal injury damages." (*Lakin, supra*, at p. 658.)

However, the *Lakin* court reasoned that, when read as a whole, the statute is best interpreted as permitting prejudgment interest to be calculated solely on personal injury damages:

> "The first paragraph of [Civil Code] section 3291 permits the plaintiff in 'any action brought to recover *damages for personal injury* . . . to claim interest on the damages alleged' (italics added). We understand the Legislature to have intended this narrower language, which confines the availability of prejudgment interest to 'damages for personal injury,' to limit the broader language of the second paragraph. To adopt the broader reading of the second paragraph would render the narrower language of the first paragraph nugatory." (*Lakin, supra*, 6 Cal.4th at p. 659.)

In *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516 (*Hess*), the Supreme Court considered whether "a plaintiff may recover interest on interest accrued [i.e. compound interest] under Civil Code section 3291 from the date of the section 998 offer to the date of judgment because this prejudgment interest must be included in the judgment pursuant to [former] rule 875 of the California Rules of Court." (*Hess, supra,* at p. 523.) The *Hess*

33

court concluded "the language and history[20] of Civil Code section 3291 precludes inclusion of the prejudgment portion of the interest in the judgment for purposes of compounding the interest." (*Hess, supra,* at p. 532.) The *Hess* court further stated, "Prejudgment interest accrued under Civil Code section 3291 is not part of the judgment, and a plaintiff may not obtain interest on this prejudgment interest." (*Hess, supra*, at p. 533.)

4. *Application*

Bean has not cited any case, nor has our independent research uncovered any case, suggesting that Civil Code section 3291 prejudgment interest may be awarded on costs. Further, both the language and logic of *Lakin* support the conclusion that prejudgment interest may *not* be awarded on costs. The *Lakin* court "conclude[d] that [Civil Code] section 3291 authorizes courts to award prejudgment interest only on *damages attributable to personal injury*" (*Lakin, supra*, 6 Cal.4th at p. 659, italics added), and stated that such a conclusion was consistent with the Legislative intent evinced in the first paragraph of the statute, which it found to be controlling. (*Ibid.*)

While Bean contends that the trial court properly awarded prejudgment interest on costs because "costs are part of a judgment," his argument is similar to the argument that was rejected in *Hess*, namely that prejudgment interest is to be awarded on prejudgment interest "because . . . prejudgment interest must be included in the judgment." (*Hess,*

_____

20    The *Hess* court noted that during the enactment of the bill that became Civil Code section 3291, the Assembly deleted a provision allowing for the compounding of interest. (*Hess, supra*, 27 Cal.4th at pp. 531-532.)

*supra*, 27 Cal.4th at p. 523.)  In any event, even if we were to conclude that prejudgment interest is to be awarded on the *judgment*, costs are not ordinarily considered *part* of the judgment; rather, they are "normally viewed as an *incident* of a judgment."  (*Brown v. Desert Christian Center* (2011) 193 Cal.App.4th 733, 740.)  Thus, following the *Hess* court's reasoning, prejudgment interest may not be awarded on costs, because costs, like prejudgment interest, "are not part of the judgment."  (*Hess, supra*, at p. 533.)

Finally, we are not persuaded by Bean's contention that "a plaintiff's outlay of costs is necessarily a lost use of money," and therefore, that his interpretation fosters Civil Code section 3291's purported policy goal of "compensating personal injury plaintiffs for loss of use of money during the prejudgment period."  (Quoting *Lakin, supra*, 6 Cal.4th at p. 664.)  Immediately preceding this sentence, the *Lakin* court stated, "For more than a century it has been settled that one purpose . . . of prejudgment interest in general, is to provide just compensation to the injured party for loss of use of *the award* during the prejudgment period."  (*Id.* at p. 663, italics added; see also *Deocampo v. Ahn* (2002) 101 Cal.App.4th 758, 781-782 [stating that "the purpose of Civil Code section 3291 to compensate plaintiff for the loss of use, during the prejudgment period, of *the damages* to which [plaintiff] was entitled due to [defendant] having negligently treated him," italics altered].)  We think it clear that the purpose of Civil Code section

35

3291 is to compensate plaintiffs for the loss of use of the money awarded for personal injury *damages*, *not* for the loss of use of money for *costs*.[21]

Accordin*g*ly, we conclude that the trial court erred in awarding prejudgment interest on costs.

## IV.

## DISPOSITION

The trial court's order denying Pacific Coast's motion for new trial is affirmed.

The trial court's order awarding Bean prejudgment interest is reversed only insofar as it awards prejudgment interest on costs. In all other respects, the trial court's order awarding Bean prejudgment interest is affirmed.

The judgment is reversed only insofar as it awards prejudgment interest on costs. The matter is remanded to the trial court with directions to recalculate prejudgment interest in a manner consistent with this opinion and enter an amended judgment. In all other respects, the judgment is affirmed.

---

[21] "Recovery of litigation *costs* . . . is *not* considered part of an award of *damages.*" (*Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, 1065.)

In the interest of justice, Pacific Coast shall bear costs on appeal.

                                                            _____

                                                                           AARON, J.

WE CONCUR:

_____

             McCONNELL, P. J.

_____

                HUFFMAN, J.